UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,

v.

DANIEL ARCHIBALD,

            Defendant.

Action No. 2:15-cr-0134

**OPINION & ORDER**
**FILED UNDER SEAL**

**THIS MATTER** comes before the Court on Defendant's omnibus motion to dismiss insofar as Defendant moves to suppress evidence pursuant to Rules 12(b)(3)(C) and 41(h) of the Federal Rules of Criminal Procedure; also ripe for disposition are Defendant's request for a <u>Franks</u> hearing and Defendant's motion to disqualify counsel for the Government. (Mot. to Dismiss, ECF No. 11; Supp. Brief, ECF No. 42; Mot. to Disqualify, ECF No. 47.)[1] The Government opposes the motions. (Opp., ECF No. 24; Letter, ECF No. 43; Letter, ECF No. 44; Letter, ECF No. 49.) The Court held an evidentiary hearing on December 20, 2016 at which a federal agent and two confidential informants testified, and received post-hearing briefing. (ECF Nos. 61-63.) For the reasons set forth below, the Court denies the motion to suppress, denies the request for a <u>Franks</u> hearing, and denies the motion to disqualify.

**I.**    **Background**

In denying Defendant's motion to dismiss the indictment, ECF No. 34, at 1, the Court summarized the instant matter as follows: Defendant, a crewman aboard a tuna fishing vessel, the Capt. Bob, is accused via a two-count indictment of knowingly conspiring, in violation of 18 USC § 371, and knowingly taking marine mammals on the high seas by means of a firearm in violation

---

[1] References use page numbers assigned by CM/ECF.

of the Marine Mammal Protection Act (MMPA), 16 USC §§ 1372(a)(1) and 1375(b), and 18 USC § 2. In short, the Government alleges that Defendant "and others used firearms to shoot at pilot whales onboard the [vessel] on the high seas, resulting in the serious injury and death of a pilot whale." (Id., ¶¶ 3-8.)

## II. The Motion to Suppress

The instant motion concerns the Government's use of two confidential informants, CI-1 and CI-2, in the course of its investigation and, in particular, evidence gathered as a result of CI-2's entry onto the vessel. It is undisputed that CI-2 boarded the vessel, took photos of a firearm thereon, and provided the photos to the Government. In support of his motion and by reference to the Fourth Amendment, Defendant argues that a subsequent search warrant[2] "was partially predicated on information that was obtained through an illegal warrantless search by CI-2[]" and submits that, "after he became a confidential informant and expecting a financial reward[, CI-2] traveled to the Capt. Bob in Southern New Jersey from his location, illegally boarded the vessel and broke into the forepeak to take photographs of the [rifle.]" (Motion, ECF No. 11-1, at 54, 59; Supp. Brief, ECF No. 42, at 4-7.) Defendant thereby contends that suppression from use at trial of the photos, the gun, and fruits of the search warrant is warranted because the Government knew of or acquiesced to the intrusive conduct and CI-2 intended to assist law enforcement in conducting the search. (Id., ECF No. 11-1, at 60-63.) In opposition, the Government "concede[s] that CI-2 boarded the Capt. Bob with a law enforcement purpose[,]" but denies that the Government directed or acquiesced to CI-2's conduct. (Letter, ECF No. 49, at 4; Opp., ECF No. 24, at 48-49.)

The Fourth Amendment's protection generally applies only to governmental action. Reedy v. Evanson, 615 F.3d 197, 225 (3d Cir. 2010) (citing United States v. Jacobsen, 466 U.S. 109, 113

---

[2] USA v. Search Warrant, 14-mj-7180, ECF No. 1 (under seal).

(1984)); Skinner v. Railway Labor Executives'Ass'n, 489 U.S. 602, 614 (1989) (providing that such protection does not extend to a search or seizure "effected by a private party on his own initiative"). However, the Fourth Amendment protects against searches conducted by a private party if that party acted as an instrument or agent of the Government. Jacobsen, 466 U.S. at 113-14. Another Court in this Circuit has observed that, "[w]hile the Third Circuit has yet to articulate a test for use in determining an individual's private or governmental status, eight of its ten sister courts of appeals have focused the inquiry on the following factors: 1) whether the government knew of and acquiesced in the intrusive conduct, and 2) whether the party performing the search intended to assist law enforcement efforts or to further his own ends." United States v. Jackson, 617 F. Supp. 2d 316, 325, n.8 (M.D. Pa. 2008) (collecting cases and observing that the First and Second Circuits declined to adopt test-based approaches[3]). That Court further noted that, "[g]iven the overwhelming consensus regarding the appropriate test to be applied to a governmental action inquiry, the court will follow suit and apply the aforementioned standard to the instant case." Id. More recently, the Third Circuit tacitly endorsed such an approach when, albeit without reference to case law or a particular standard, it found that a District Court that applied the aforementioned two-prong standard[4] did not "err by finding that [airline] employees were not acting as agents of law enforcement or at the direction of law enforcement[ where an airline employee] testified that

---

[3] Those approaches nonetheless comport with the majority inquiry and their application would not change the result reached here because they center on the same concerns and turn on the particular facts presented. See United States v. Momoh, 427 F.3d 137, 140-41 (1st Cir. 2005) (stating that "any specific standard or test attempting to distinguish government from private action is likely to be oversimplified or too general to be of help[,]" and identifying such factors as "the extent of the government's role in instigating or participating in the search, its intent and the degree of control it exercises over the search and the private party, and the extent to which the private party aims primarily to help the government or to serve its own interests" (internal citations and quotations omitted)); United States v. Wolfson, 160 F. App'x 95, 97 (2d Cir. 2005) (concluding that no unlawful search occurred and considering the Government's acquiescence, knowledge, or encouragement, as well as the Government's perception of the situation in allegedly approving a search); United States v. DiTomasso, 81 F. Supp. 3d 304, 309, n.30 (S.D.N.Y. 2015) (noting "unsettled" area of law, but citing Wolfson as well as other Circuits in considering party's motivation in performing search).
[4] Memorandum Order, United States v. Mitchell, 09-cr-00105, ECF No. 1640, at 5-6 (W.D. Pa. July 13, 2013).

she opened the suitcase not for any law enforcement purpose." United States v. Mitchell, 625 F. App'x 113, 117 (3d Cir. 2015), cert. denied, 136 S. Ct. 1161 (2016). "The burden of proving that a private search is governmental action lies on the movant[.]"[5] Johnson v. United States, 971 F. Supp. 862, 867 (D.N.J. 1997) (collecting cases); United States v. Feffer, 831 F.2d 734, 739 (7th Cir. 1987) ("[I]t is the movant's burden to establish by a preponderance of the evidence that the private party acted as a government instrument or agent.").

Following this standard and accepting as supported by the record the Government's concession that CI-2 intended to assist law enforcement, the Court considers whether the Government knew of and acquiesced in CI-2's intrusive conduct. Defendant called the following witnesses at the evidentiary hearing: NOAA Special Agent Jason Couse (Agent Couse) as well as the two confidential informants (CI-1, CI-2, or the informants), who are commercial fisherman on a different vessel from the Capt. Bob. Also, among the exhibits introduced were sworn statements from NOAA Special Agent Matthew Gilmore (Agent Gilmore) offered in support of a search warrant application. It must be noted in the first instance that the evidence presented revealed no basis to discount the credibility of the witnesses—although it is plain that these individuals nonetheless had sharply contrasting perceptions due to their distinct positions in the midst of ongoing state and federal criminal investigations. In the following findings of fact,[6] the Court accordingly is careful to summarize events from each perspective.

In the Government's view, "CI-1 and CI-2 originally came to the attention of NOAA agents after they were stopped by state officers for minor violations[ and t]he state officers told

---

[5] Though the parties dispute which side bears the burdens of production and persuasion, in light of both the voluminous record developed in advance of the hearing as well as the testimony received, the Court is satisfied that the result would be unchanged by a different burden.
[6] United States v. Lowe, 525 F. App'x 167, 169 (3d Cir. 2013) (remanding for further proceedings where district court failed "to make specific findings of fact in denying defendant's motion to suppress in weapons prosecution" such that it was unclear which of four differing accounts were credited).

CI-1 and CI-2 that if they had information about more serious violations, they could receive leniency. CI-1 and CI-2 indicated that they had information about the shooting of a pilot whale[.]" (Motion, ECF No. 11-2, at 36-37, Ex. D, Gilmore Aff., ¶ 15, n.1; USA v. Search Warrant, 14-mj-7180, ECF No. 1.) The informants essentially corroborated this account, though they offered considerable emphasis on the threats issued by state and federal agents to secure and maintain the informants' cooperation; these threats ranged from arrest on CI-1's outstanding warrant, to forfeiture of the informants' commercial fishing licenses, to general and apparently unsubstantiated threats of arrest. (Hearing Transcript, at 110-20, 123-25, 128-33; Hearing Ex. 18-19.) For example, CI-2 recalled "saying something to the effect to [Agent] Couse that [CI-2] didn't want to cooperate anymore, and [Agent Couse] would say something to the effect of 'that's unfortunate for you.' And [CI-2] took it as a threat." (Id., at 116.) CI-1 likewise testified that Agent Couse told them that they would "go to jail" if they ceased cooperating. (Id., at 131-33.) CI-1 could not identify a particular reason for which they could be jailed, but noted that, "when you've got a fed sitting there threatening you, you're going to go to jail." (Id., at 133.)

The informants further emphasized that agents were keen from the outset to secure information regarding individuals on the Capt. Bob and the shooting of the whale. (Trans., at 133.) And, "[i]n or about April 2014[, . . .] CI-1 stated that he heard the crew of the [Capt. Bob] say that they shot a pilot whale." (Motion, ECF No. 11-2, at 36-37, Ex. D, Gilmore Aff., ¶ 15, n.1; USA v. Search Warrant, 14-mj-7180, ECF No. 1.) Around that time, Agent Couse and CI-2 discussed Defendant, his shipmates, and a firearm on the vessel:

| | |
|---|---|
| CI-2: | Did [law enforcement] have a bullet from inside [the whale]? |
| Agent Couse: | A thirty caliber round. |
| CI-2: | Well, then, they had good ballistics on it? |
| Agent: | I believe so. |
| CI-2: | Well that should be easy enough. You won't need me for that. |

>       Agent Couse:  Well, ya know, I have to be able to get ahold of the firearm. I have to know where the firearm is.
>       CI-2:         If, I could tell you this though, if I see them come down carrying one and goes on that boat, then we could just give you a call.
>       Agent Couse:  Yeah, definitely, give me a call.

(Interview, April 24, 2014, Ex. 18, at 30-31; Opp., ECF No. 37, Ex. A; Supp. Brief, ECF No. 42, at 9-10.) On the same day, Agent Couse and CI-1 had the following exchange:

>       Agent Couse:  All right. Anything else, as far as the whale, that might help me? And, and here's the thing. If I can, if I can corroborate all this stuff another way, I don't have to bring your name out as early.
>       CI-1:         Exactly, that's what I'm trying to discourage.
>       Agent:        Well I can't promise. You know, in the end, well when we're in Court. But I can do everything I can. If I can corroborate—if you can give me something and say, hey, go look here and you'll see this.
>       CI-1:         Go and, yeah. Can't you just go look for the rifle, maybe?
>       Agent Couse:  Not without a warrant. I mean . . .
>       CI-1:         Like even if it's just sitting on the boat, you need a warrant to search their boat? I thought you guys can just go on and search whenever the fuck you want.

(Interview, April 24, 2014, Hearing Ex. 13, at 36-37 (edited to account for overlapping speech).) In addition, from around May to July of 2014, agents utilized a surveillance camera at the dock in an effort to see the firearm carried on or off the vessel—though the camera was ineffective because persons at the dock learned of its existence. (Trans., at 62-65, 70-75; Hearing Ex. 23-25.)

Subsequently, "[i]n or about August 2014," CI-2 told agents that, "after his initial interview with the agents, he was aboard the [vessel] in or about August 2014, and saw a rifle[ and] took photographs of the rifle[.]" (Motion, ECF No. 11-2, Ex. D, Gilmore Aff., ¶ 20; Opp., ECF No. 37, Ex. C; Trans., at 78.) CI-2 then transmitted the photos via text message to Agent Couse, who concluded that the antiquated rifle fires a certain type of cartridge, "which is one of the three possible types of cartridges that forensic analysis connected to the bullet recovered from the body of the pilot whale." (Id.) Though Agent Couse previously reported that CI-2 stated that he went

onto the Capt. Bob to change his clothes, id., Hearing Ex. 26-27, CI-2 testified that he boarded the boat with the intention of photographing the rifle as a result of the threats from law enforcement. (Trans., at 123-24.) On this point, CI-2 said that he "assumed" that they would "leave [him] alone" and his involvement would come to an end after he provided the pictures to law enforcement, id., and stated that he would not have "done any of this if it wasn't for the threat [against his license.]" (Id., at 117.) CI-1 added that, while he was unaware of CI-2's intentions and actions until after the fact, "every time [CI-1] turned around, [law enforcement was] calling us into their little office[]" and Agent Couse previously advised him to photograph or record anything notable that he saw or heard. (Id., at 129-34.) CI-1 also testified that it was his impression throughout that law enforcement was seeking the gun, although he lamented CI-2's actions:

> Q: Do you know why [CI-2] – did you talk to [CI-2] before he went on the boat?
> A: No. I actually didn't learn that [CI-2] did that until days after the fact. I mean, I was out of town [. . .] at the time that he did that. And I remember when I came back and I heard that he had done that, he might have mentioned it to me, I heard that he had done that, I asked him why in the hell he would have done that. Because – I don't know. Just giving them what they needed. Why – why in the hell would he have done that.
> Q: And he said giving them what they needed?
> A: Yeah, why would he have taken the picture of that, I didn't really understand what . . .

(Id., at 132-33.) On cross-examination, however, both informants unequivocally stated that there were no threats, promises, compensation, or encouragement made by law enforcement explicitly in reference to boarding the Capt. Bob and taking pictures thereon. (Id., at 120-25, 134-35.) Agent Couse likewise testified on cross-examination that he neither directed nor threatened the informants with respect to the boat, photographs, fishing licenses, or outstanding warrants. (Id., at 105-07.)

The issue presented is a close one and the parties thoroughly canvass the record and limited authority available, though no case dictates the result reached here on account of the fact-sensitive inquiry and unique situation presented.[7] See Jackson, 617 F. Supp. 2d at 325; accord Momoh, 427 F.3d at 141. First, the evidence shows that law enforcement issued generalized threats and Agent Couse made subtle suggestions to the informants, i.e., "I have to be able to get ahold of the firearm. I have to know where the firearm is." and "[I]f you can give me something and say, hey, go look here and you'll see this." The evidence similarly shows that the informants not only perceived such threats to require assisting law enforcement but also understood the rifle to be a desired and necessary part of the investigation.

However, there is no evidence that law enforcement specifically instructed—under threat of reprisal, promise of reward, or otherwise—either informant to take such action. And, though Defendant emphasizes the informants' status as such and the Government's purportedly problematic cooperation agreements with them, there is no basis to conclude that the informants were influenced or emboldened by the agreements or that CI-2 actually acted within the scope of the same. There is likewise insufficient evidence to support Defendant's position because, insofar as law enforcement issued threats, they were vague as to consequences and such pressure pertained to continuing cooperation in general terms, as opposed to particular actions to be undertaken. Moreover, the testimony demonstrates that CI-2 undertook the search on his own initiative and Agent Couse was unaware of it until after the pictures were taken.

---

[7] To be clear, it bears noting that although no prior case is closely analogous to this one, the presence or absence of certain facts nonetheless appear to recur in the case law—e.g., prior or ongoing officer-informant relationships, paid informants' express direction from law enforcement, informants seeking to avoid prosecution, informants and defendants as neighbors or in proximity, trespass, third party businesses assisting police, and airport and parcel carrier inspections.

The foregoing belies a finding that the Government knew or acquiesced to CI-2's actions and this is supported by case law as, for example, a search has been found to be private where law enforcement directed an informant to notify them of suspicious activity at the informant's neighbor's property, but offered no express direction to trespass and only learned later that the informant trespassed to surveil drug activity. United States v. Bazan, 807 F.2d 1200, 1203-04 (5th Cir. 1986). Similarly, there was no constitutional violation where an informant, who previously participated in drug purchases at the behest of police, entered the defendant's property to investigate a marijuana grow operation because there was no evidence that police "asked [the informant] to seek out manufacturers of marijuana or even knew of [his] entry on [the defendant's] property until after it occurred." United States v. Malbrough, 922 F.2d 458, 462 (8th Cir. 1990); see also United States v. Silva, 554 F.3d 13, 19 (1st Cir. 2009) (no violation where officer "encouraged" informant to gather items, but officer was unaware that search would have to be conducted for items and otherwise "did not participate in the search and exercised no control over the manner in which it was conducted").[8]

Further, while Agent Couse may have chosen his words poorly in discussing prospective useful evidence and while the informants understandably perceived their situation to be a tenuous one, any suggestive comments were slight and were made amidst numerous exchanges in the fraught informant-law enforcement relationship. This is insufficient to convert the search from a private one. See Pleasant v. Lovell, 876 F.2d 787, 797 (10th Cir. 1989) (collecting cases for the

---

[8] An additional example, albeit with less clarity, comes from United States v. Miller, 688 F.2d 652, 657 (9th Cir. 1982). There, the Court upheld the denial of a motion to suppress and seemingly rejected the Government's concession of knowledge and acquiescence insofar as the Court emphasized facts bearing on that prong without expressly accepting the concession or stating whether both prongs weren't met. The informant in Miller assisted police by trespassing to take pictures of his own stolen property after police told him it "was up to him" whether he had a right to enter the defendant's property; the Court stressed that there was no tacit approval by the Government because there was "nothing in the record to suggest that the officers encouraged [the informant] to act on their behalf, or even planted the idea of conducting a private search." Id., at 656-57.

proposition "that there is no conduct foreclosed by the fourth amendment when a private person voluntarily turns over property belonging to another and the government's direct or indirect participation is nonexistent or minor"); United States v. Walther, 652 F.2d 788, 792 (9th Cir. 1981) ("Mere governmental authorization of a particular type of private search in the absence of more active participation or encouragement is similarly insufficient to require the application of fourth amendment standards." (citations omitted)).

On balance, and contrary to Defendant's assertions, the situation presented therefore is distinguishable from ones in which authorities knew or acquiesced to the search. See United States v. Stein, 322 F. Supp. 346, 348 (N.D. Ill. 1971) (employing standard deviating from "mechanical application of general rule" in granting motion to suppress where there was a "clear pattern [] of attempts to procure" cooperation in the midst of a looming indictment because the "government was [not] totally divorced from the situation under which [the informant] came into possession of [] records" at issue). CI-2's actions are properly characterized as a private search and, because Defendant failed to demonstrate otherwise, the motion to suppress is denied.[9]

## III. The Motion to Disqualify

Defendant moves to disqualify "prosecution counsel because of an apparent and actual conflict of interest." (Motion, ECF No. 47-1, at 4.) By reference to the New Jersey Rules of Professional Conduct and U.S. Justice Department Regulations, Defendant contends that disqualification may be appropriate on account of the Assistant United States Attorneys' need to discredit their own confidential informants' allegations of threats or coercion and, in addition, to ignore the informants purportedly illegal conduct. (Id., at 7-11, 14-15.) Defendant accordingly requests "that the Court engage in an inquiry to determine whether a conflict exists and whether

---

[9] Since the search was private, the Court need reach the Government's arguments, Supp. Brief, ECF No. 62, at 13-19, regarding the good faith and motor vehicle exceptions—or whether they were properly raised.

the current prosecution team must be disqualified." (Id.) In its brief response, the Government characterizes Defendant's assertions as "unfounded [and] legally unsupportable[.]" (Letter, ECF No. 49, at 3-4.)

The Court previously declined to disqualify counsel for the Government and "not[ed] that the record presented is insufficient to support any finding of misconduct so as to warrant, e.g., disqualification of counsel, [] with the understanding that the parties' requests may be renewed subsequent to the upcoming evidentiary hearing upon submission of competent evidence[.]" (Order, ECF No. 51, at 1.) Upon review of the informants' testimony and the record as whole, the Court perceives no conflict of interest or other cause for disqualification; the Court is likewise satisfied that the informants' were ably represented by appointed counsel. There being no change in circumstances or competent evidence to support disqualification under any standard, the Court denies Defendant's request.

## IV. Franks Hearing

Lastly, Defendant's request for a Franks hearing and suppression of the search warrants for want of probable cause remains outstanding. (Motion, ECF No. 11-1, at 53-67.) Defendant's contentions overlap somewhat with issues already decided in the Government's favor, i.e., regarding the Government's alleged failure to properly describe and charge a crime as well as the character of CI-2's entry onto the vessel, but also concern alleged misrepresentations to the Court concerning descriptions of the whale, rifle, and ammunition. See id. The Government maintains that the MMPA was properly described at all times, that there was no lack of probable cause, and that there were no misrepresentations. (Opp., ECF No. 24, at 38-52.)

The Fourth Amendment requires that an evidentiary hearing be held to examine the truthfulness of a search warrant affidavit if a defendant makes a "'substantial preliminary showing'

that the affidavit contained a false statement, which was made knowingly or with reckless disregard for the truth, which is material to the finding of probable cause." United States v. Yusuf, 461 F.3d 374, 383, n. 8 (3d Cir. 2006) (quoting Franks v. Delaware, 438 U.S. 154, 171 (1978)). "In order to make this preliminary showing, the defendant cannot rest on mere conclusory allegations or a 'mere desire to cross-examine,' but rather must present an offer of proof contradicting the affidavit, including materials such as sworn affidavits or otherwise reliable statements from witnesses." Id.

The Court is now quite well-acquainted with the record in this case and, simply put, there is a paucity of evidence to support Defendant's assertions on these issues. There is little basis—let alone a substantial preliminary showing—to conclude that the Government misled any Judge as to the crime alleged and the bases therefore. As the Government summarizes, the affidavits set forth coherent and complete accounts fairly reflecting the evidence and investigation. Defendant's arguments more closely resemble defenses and challenges to the Government's case and, of course, Defendant will have a full and fair opportunity to pursue such avenues at trial through evidence, cross-examination, and lay and expert testimony. Defendant's remaining requests, accordingly, are denied.

**ACCORDINGLY, IT IS** on this 17th day of April, 2017,

**ORDERED** that Defendant's omnibus motion (ECF No. 11) is denied in part; and

**ORDERED** that Defendant's motion to disqualify (ECF No. 47) is denied; and

**ORDERED** that this Order shall be placed under seal, with the parties afforded fourteen (14) days to offer submissions regarding whether the Order shall remain under seal in whole or in part; and

**ORDERED** that the Court will hold a teleconference, to be initiated by the Government, on April 25, 2017 at 1:30 PM.

*s/Cathy L. Waldor*
**CATHY L. WALDOR**
**United States Magistrate Judge**